Wactor v. Jackson National Life Insurance Company Good morning. Good morning, Your Honor. I'm Gary Polikoff. May it please the court. I represent Nancy Wactor, who is the appellant, also the plaintiff. She is also the sole beneficiary under this life insurance policy. She is the wife of the decedent, and she's PR of the estate. William Wactor, her husband, paid 19 years on a 20-year term life policy. In his last year of the 20 years of the policy, he suffered from dementia and cognitive loss. He apparently missed the last two payments under this policy. Over the course of the policy... For the whole 20 years, the policy would have been his, and he would have had no further payments. Is that right? This was a term life. That's what I thought, but I didn't understand. What do you mean a 20-year term policy? The term was for 20 years. If he paid all the payments, it ends, expires at the end of the 20 years. Actually, if he paid the whole thing and he died, another person, paid a 20-year policy and dies in the 22nd year, he's not being paid anything under the policy. That is correct. It's not a whole life policy. It's a term life. And Your Honor is correct that that's how the term would have worked. He was still in the 20 years, in the final year of the 20-year term after having paid the 19 years. He suffered from dementia, apparently missed the last two payments. Over the course of the term, there had been a course of dealing established. He had been late with his payments 22 times, admitted by the defendant. And on those 22 occasions, late payments were accepted. The payments were quarterly? Quarterly at that point. Earlier in the term, they had been monthly, but they had been changed to quarterly. And at this point in time, the last few years, it was quarterly. On those 22 occasions where he had late payments accepted, there were notices provided and apparently the notices were actually not only mailed to him, but actually furnished to him. A distinction between mailing and actually furnishing to him. In any case, on June 10 of 2010, Nancy, the wife's sole beneficiary, telephones the defendant. She reports, and this is all the transcript is in the record, reports that he has Parkinson's disease. And the representative on the phone pulls it up on computer screen and says, we show the policy lapsed. The wife says, can I make up the payments? If you'll tell me how much, I'll make up the payments. They refuse to give her any information. They say that the policyholder must call or a person with the power of attorney. She says, I have a health care power of attorney. He says, that's not sufficient. He says, have the insured call us. And the wife ends the conversation saying, maybe he can at some point, but he's not able to at this point. In the policy, there's a crucial clause called reinstatement. And the section in the policy is titled, how a policy in default may be reinstated. Simply by providing evidence of insurability and catching up the payments with interest. To refuse the information to the wife to allow her to use the right of that reinstatement, which is in the policy, the defendant arbitrarily uses this clause called the quote, privacy policy, to refuse information to the wife. Now, in the privacy policy, the defendant, the insurance company, has the right to give any personal financial information of the insured to any affiliated parties and unaffiliated third parties. Anybody it chooses to, affiliated or unaffiliated third parties, the insurance company can give financial information to. Yet it uses the privacy policy as a sword against the wife and refusing to give her the crucial information she needed, which was, here's what you need to do, catch up the payments, here's the amount that you owe. And of course, she could have also determined immediately that all she needed was a letter from the doctor likely to satisfy the evidence of insurability. In any case, they refuse to give her any information. As to the privacy policy, I took the depositions of the vice president of claims for the defendant and a customer service representative and others. They're unable to say who the unaffiliated and affiliated third parties are who can receive information. They're unable to give us any guidelines as to how to determine who the third parties are who can receive personal financial information. And they can't tell us anybody at Jackson National who has the answer to those questions. Yet they use it when it suits their purposes to refuse the crucial information to the wife. Who was this person on the other end of the phone? A service representative, her name is in the record, a low-level service representative. But she's able, admittedly, to pull up his entire profile on the screen. Now, was that person proposed? No, but other people were who adequately described the scenario and the situation. You have the one side of that conversation in the record here from your client. No, the transcript of the entire conversation is in there and recorded. The recorded conversation, okay. It's a recorded conversation with both parties. So it's fully developed as to what the conversation was. But in any case, information, crucial information to the wife which would have allowed her to reinstate. And the reinstatement provision, by the way, in the policy is quite liberal. It says that for five years, the insured may reinstate the policy. But he has to provide evidence of insurability. Yes, sir. Your honor is correct. Well, this fellow was in the hospital, this was the day before he died. It was the day before he died, but nobody knew at that point in time for certain that he was going to die. All he needed was evidence of insurability. Insurability, by the way, is not defined in the policy. Insurability nowhere is defined, nor are there any guidelines at Jackson to tell us about how one determines insurability. The wife was reporting at that time that he has Parkinson's disease and he's unable to contact. You said he had dementia. Yes, sir, he does. There are several doctors that have diagnosed dementia. He had Parkinson's disease and dementia. It's been pretty hard for him to get evidence of insurability. Potentially, your honor. But that's a jury question as to whether, first of all, what are the criteria for insurability? They're not defined in the policy, nor are they defined in guidelines at Jackson National. And so then it becomes a jury question as to what are the guidelines of this term, quote, insurability. And number two, did he meet that or not? All factual issues for a jury to decide, your honor. In any case, he dies June 11th. June 16th, the defendant commits fraud. They issue a letter which is absolutely false. They have a statutory duty and a duty established by case law in South Carolina to do a reasonable review and investigation. They issue a letter dated June 16th. It bears a signature from a Vice President Fields. I took Mr. Fields' deposition, and he and others admit Fields never once saw this claim, reviewed it, had any involvement with it whatsoever in the year 2010. It was not until a few days before his deposition in October of 2012 that he had any review whatsoever of the policy. So as far as their duty of review and duty of investigation, they issue an absolutely fraudulent letter. There's nothing truthful about that letter. It says we have conducted a review. Mr. Fields admits that he had conducted no such review, nor had any other review been conducted at that point in time. The letter was simply fraudulent and false. After that, a low-level customer service representative, Kevin Schweda, looks only at the computer log to see that, according to their computer log, that notices were sent, and he looks at the date of death. He says that already he knew that the Vice President letter had gone out. Apparently, it's a computer-generated letter, and the company puts a signature on it. He doesn't actually review it, have any involvement with it, or sign it. The customer service rep does not consider the dementia of the insured, the wife's call of June 10, her efforts to do what would be tantamount to exercise the right of reinstatement, doesn't consider the course of dealing over the 22 times of late payments, doesn't consider whether the notices were actually received by the insured or any of those things at all. It only looks at, here's our computer log that shows two mailings. Two mailings are all they did by their own testimony in 2010, and it looks at the date of death. After this, Nancy and her daughter do a diligent search. They find no evidence in her husband's information and records. They even find a file labeled insurance. They don't see any evidence of the grace period notice or the lapse notice or anything else from Jackson National in the year 2010. So by doing this, not only does the carrier refuse to consider the course of dealing and whether or not the insured actually received the notices, but then they deprive the wife of her right to reinstate, which is an extremely important provision at this point in this policy. They rely instead on Jackson's computer log. There are problems with reliance upon Jackson's computer system log. First of all, we know that their computer system spits out these computer-generated supposed review letters, when at that point in time no review of any kind had taken place. They have this use of this privacy policy where they can give private personal financial information to anybody they want to, undefined as to who the third parties are who might receive it. And then we've got other problems with the log as well. The servicing agent, Peter Brooks, is cc'd on these last two notices, and there's no evidence even from Jackson that they mailed to him, and Mr. Brooks testified that he didn't have any idea whether or not he had received them. The legal issues, primarily waiver, estoppel, and bad faith and its counterpart, duty of good faith and fair dealing, are well established in law. As to waiver, the defendant undertook a duty. They had this course of dealing. In the prior times, apparently they not only mailed, but actually furnished, meaning the insured received it, and they failed to consider that. As for estoppel... Excuse me, the source of the duty, the course of dealing, not anything that is insurance, is that correct? That is correct, Your Honor, that's established by case law. As to estoppel... Did he acknowledge that the notices were mailed? We don't have any information... We have to look at the facts in light of what's favorable to you, summary judgment, right? Yes. On the evidence here, were the notices mailed? We do not know. We know that the wife and daughter... Well, then you say that... Are you... Is your contention on the evidence here that notices were never mailed? It's our contention that, at a minimum, it's a jury issue, and we have no evidence of mailing. We have to look at the facts one way or another here, and we have to give you, actually, the benefit of the facts. So I'm just trying to say, your contention as to the facts that we have to accept is what on the mailings? That the wife and the daughter made a search and found nothing, and that the defendant's only information about the mailing is their computer system, which we know is a flawed system to begin with. And so with that combination of their relying on a flawed system and testimony from the family that we searched and found nothing, we believe it's, at a minimum, a jury issue for a factual determination as to whether they were mailed, whether they were furnished to the insured. In any case, as to waiver or stop... But if they were mailed, there's a presumption of receipt. Right? A normal... That's the general proposition. That's something that's placed in the regular mail, is received... It has a stamp on it, and that's properly addressed. It's received by the person who's mailed it. We believe that under the... That's the law, right? There's a presumption of receipt. There is case law that says what Your Honor has just articulated. However, we believe that with the established course of dealing, that the notices were actually furnished. That is, that they undertook a duty to actually furnish, meaning more than mail, actually furnish, make sure he gets it, the notices. And then he actually... No, the presumption can be rebutted. It's a rebuttable presumption. A presumption can be rebutted, presumably, by evidence so that it was never received. And we... Of course, Mr. Wachter is... He was trying to figure out if you admit that the presumption applies here, and your position is you rebutted it. We believe that the course of dealing, where 22 times they actually furnished the notice... Well, that's where you got the notices and paid the things within the grace period. Yes, sir. Here, you're equivocating on whether you got them or not. There's no equivocation on whether you paid them. You didn't pay them. There's no evidence of payment. I've given your honor all the evidence that we have as to the issue of mailing... But whether you got the notice or not, the premiums were due quarterly, and everybody knew that. Premiums were due quarterly. And if he had dementia, maybe that's an issue. But the wife knew it. The beneficiary, she knew that there were quarterly payments due on the life insurance problem. She had... She had been making some of them, but she'd made several of them herself. She had made some of them. Now, she didn't know the exact dates they were each due because he primarily handled that. She had written checks. She knew about how much money it was. Why didn't she just send a check in? She had. And frequently, he would ask her, would you make the payment? And they maintained separate bank accounts. And when she would make the payment, he would reimburse her for it. But it was him coming to her all those prior occasions saying the payment is due. Testimony is that he received the notices. He picked up his own mail. He still drove himself these last few months. And as is typical, one doesn't become totally demented one day when the prior day he was lucid. There are times and periods, even within the same day, of lucidity and confusion. What's your best theory here? You make a shotgun approach, four or five different theories. What's the best one? My time is up, but if I could answer that, please, sir. Thank you. Waiver and estoppel, frankly, I believe estoppel is the greater one because estoppel and waiver and estoppel are typically frequently interchanged by courts, but they mean a bit different things. But estoppel primarily is the wife attempts on June 10 to do whatever she can. Of course, she doesn't have the policy in front of her, doesn't know the specific details of right to reinstatement, but she's doing what all a rational, reasonable person would do. Checking on it because she says, I've discovered recently that he didn't pay a credit card bill and a phone bill, and so I'm checking on this. They refuse to give her information. She still offers to catch up any payments. Had they told her, well, he missed the last two payments, and you would owe this amount of money for this, and by the way, we need some evidence of insurability, her testimony was she would have complied immediately with that. So by their arbitrary use of this privacy policy, they deprived her of the right and they should be estopped from denying the coverage. Thank you. Good morning. May it please the Court. I'm Chuck Turner here on behalf of Jackson National Life. We essentially have five causes of action in this case. Breach of contract, equitable estoppel, unjust enrichment, bad faith, and a failure to act in good faith. What I'd like to do is, there's substantial disagreement over the presentation this morning of what the facts in the record in the joint appendix are. We have to take them in the light most favorable to his client? Yes, sir, I agree with that, except they've got to be established in the record. It's got to be in the joint appendix for the appellant to rely on. It has to be in the record. It has to be in the record. It has to be in the record. It has to be in the record. I think it's no dispute between us that everything that's in the joint appendix was presented to the lower court and in the record. What I'd like to do is start with the contract, the policy itself. The policy requires that premiums be made on a quarterly basis. That's a quarterly basis payment that Mr. Wachter himself had chosen. As described earlier, this was a term policy, which means as long as he makes the payments at the start of every quarter, he will get life insurance for the course of that quarter. And the payments, the quarterly payments were the same for 10 years or something? Initially it was a $400,000 face amount, and he reduced that to $200,000 at some point about halfway through to reduce his premium payment, quarterly premium payments down. But the payments are earned at the time that they're due. In other words, that he would make these payments, and then he would be insured for that period of time that those payments covered, in this case on a quarterly basis. The premium payments, if the premium payments were not made timely, within 30 days, then a grace period, a grace notice would be sent out and a grace period would apply. That is in the policy itself. The policy provides a 31-day grace period, which is consistent with South Carolina law. 3863.220i of the South Carolina Code of Laws requires a 30-day grace period. Jackson National provided Mr. Wachter a 31-day grace period to make this payment, which means that during that 31 days, if he had passed away, that he would be insured. He would get the amount of the policy, which was $200,000, less whatever premium was owed. At the end of that 31-day period, the policy would lapse. And lapse means that Jackson National didn't receive the payment and the policy would cease to exist. The policy does provide a reinstatement provision for the policy to be reinstated if proof of insurability is provided after 30 days and the premium is made up. Significantly, and I want to go back, we've talked about course of dealings, significantly, the policy is silent as to notice. There is no language in the policy as to what notice would be provided, if notice would be provided. Jackson National has a business practice of sending bills, as most businesses do. So, when a premium payment is due, in this case with Mr. Walker, on a quarterly basis, Jackson National would send him a premium notice, and that was sent. Again, undisputed, it was mailed on December 31, 2009, saying that the premium payment on the policy was due by January 25, 2010. January 25 came and went and no payment was received. On February 4, 2010, Jackson National sent a grace notice, what's called a grace period notice, saying that we didn't receive your payment, we're going to give you 31 days, pursuant to the terms of our policy, to make that payment to keep the policy in place. At the end of those 31 days, which was February the 25th, a lapse notice was generated by Jackson National because no payment had been received. And in that lapse notice, the lapse notice said that the policy had lapsed, consistent with the terms of the policy, can be reinstated within 30 days if you simply pay the premium, but after 30 days we're going to require insurability. And significantly, Your Honor, Jackson National reserved all rights under the policy. In other words, what they're saying is, although we're giving you this extra 30 days on the lapse, after lapse, we're not waiving any other terms and conditions under the policy. 107 days later, Jackson National gets the phone call. Premium payment for the first quarter was missed, premium payment for the second quarter was missed, which would have been due at the end of April. We're almost now beginning the third quarter, which would be the third premium payment that was due. And Ms. Wachter calls, as apparently Mr. Wachter is not doing well. She testified in her deposition, Your Honor, that she knew he was not going to make it. She knew that he was at the end of his life and that she wanted to try to make sure if the life insurance policy was in place. She calls Jackson National on that day, June 11, 2010, and asks them the status of the policy. Keep in mind that Ms. Wachter has no rights under this policy. She has no rights. She's not an owner of the policy. She's not on the policy to receive information. She has no rights on the policy at all other than that Mr. Wachter may have selected her as a beneficiary. But she calls and she asks for information. And the customer service representative initially was hesitant to give her that information because she was not the owner of the policy. But she ended up giving her the information, saying that the policy had in fact lapsed. She then asked what she could do to reinstate the policy. And the customer service asked her, customer service representative asked her, do you have power of attorney? She says, I have health care power of attorney. Well, do you have a general power of attorney? No, I don't. Well, can you have the insured, Mr. Wachter, the owner, call us to authorize receiving information? And she said, well, maybe he can do that later. He can't do that now. She did mention that he had Parkinson's, but there's no mention in there that he's about to die. There's no mention in there that he has been demented. And I would submit to... What happens under this policy if the insured suffers dementia? There's nothing in the policy about the insured suffering dementia. It comes up every now and then with life insurance policies. People get old. Well, it does. And I would submit to the court that it is common practice for folks to have a power of attorney in place to take care of their affairs. Unfortunately, that wasn't the case here with Mr. Wachter. We wish it was, but it was not. It's a generally accepted practice to have power of attorneys, especially if you know that you're declining in health. I'm sorry, Your Honor. It wouldn't have made any difference in this case by the time of the phone call, would it? Would have made. It had already lapsed. That's exactly right. The only difference is she did have the power of attorney. When your representative asked her if she had one, the answer to that question didn't make any difference. Let's play that out. Let's assume that she did have one. Then my customer, my Jackson Nationals customer representative, would say, oh, okay, let me tell you, this is the amount that's due. At that point, it would have been two premium payments. And since you missed the 30-day period provided by the lapse notice, you've got to provide evidence of insurability, which that is the kicker of the whole thing. He was within hours of passing away.  And the plaintiff's own expert admitted that in his deposition. So do you know that the insurance company or client does make an actual study about insurability? They have a physician in those circumstances. They don't get the two payments that are missing. Your Honor, I can honestly tell the court. I don't know what the policy says. Because that's the only thing in the record and in the joint appendix. The policy says that we have to have, that if you miss the 30-day lapse, you have to provide proof of insurability to the satisfaction of Jackson National. Now, what that process involves, Your Honor, I don't know. But that is significant because there's no evidence in the record for this court to even consider that. There's no way to know what that process would have been. When we're talking about the lapse, you can, if you are insurable, re-apply and make a lapse policy effective at any time? Seven months past, eight months past? There's a five-year limit under this particular policy, which is three years more than South Carolina law requires. South Carolina law requires two years for reinstatement upon payment of premiums and proof of insurability. We started out thinking about how this was a 20-year policy. So how does that work for 20 years or expiring? Your Honor, I'll be honest with you. I'm embarrassed to say this, but I think it's a two-year, it's a two 10-year term policy. I think he had a term policy for 10 years. As I recall, I think he had a 10-year term policy that he renewed for another 10 years. And in the process... Is that when the change in... When he changed... When the 400,000 to 200,000? Yes, sir. Yes, sir. And the premiums were going up... Yes, sir. And they reduced the amount of the benefit. Yes, sir. And he also changed his payment schedule then, too. He went from a semi-annual to a quarterly payment as well. And I'm not sure in the end, Your Honor, that makes a huge amount of difference. It's a term policy, which means as long as he's making his payments during that term, he is insured. There's been an allegation in this case that Jackson National somehow deprived him of the benefit of the bargain. And I asked Mr. Finkel, the plaintiff's expert in this case, and I asked him, I said, how did Jackson National deprive the benefit of the bargain if Mr. Wachter made payments and he was insured during the period that he made the payments? And he agreed. He said, no, he got the benefit of the bargain as long as he made the payments. And I think that hits to the heart of this case. If she died six months earlier, she'd got her $200,000. Exactly. Exactly. He missed those payments. Whether it be by dementia, whether it be by simple oversight, whether it be by intent, I don't think that's likely, but I think it's definitely possible. We don't know why he didn't make the payments. And I think, importantly, it's not up to Jackson National to deign or investigate why the payments weren't made. It's still an arms-length business transaction that Jackson National has to assume he's going to take the affirmative steps to pay his bonds. Is your position that doesn't make any difference whether you sent those notices or whether they were received or anything? Your Honor, I think it is. The notices themselves, let me clarify this. We've talked a lot about the notices. The notices themselves do nothing but confirm the terms of the policy. The terms of the policy are you will pay on a quarterly basis. And it gives them a form to send back with the check. With the check. It's nothing but a bill. Does the policy require a notice? No, it does not. The policy doesn't require notices. Now, Jackson National has a business practice of doing that. It's nothing more than a bill. And they have to provide the grace period notice because that's what's required by law, which they do. And he took advantage of that 22 times. Mr. opposing counsel, Mr. Polinkoff, wants to make an issue that we accepted late payments 22 times. They weren't late. We have to accept those payments. As long as you face them. You accept them within the grace period and you take the position that this one was beyond the grace period. There was never a payment made. There was no payment made if she had attempted to make payment in June, which she could have. Well, but if they, if you're, if you're, your person on the other end of that phone call had said, send us a check for $2,550 and evidence of insurability. And they'd sent you a check and something else that they said was evidence of insurability. Would you have been obliged to accept the check? Well, Jackson National would have to look at the insurability. What about the check? Would you put the check in the bank? Well, I think if she's not in, if they're not insurable, the check would have to be returned. No. So you wouldn't put the check in the bank? No, I don't think we put the check in the bank. I mean, we're dealing with hypotheticals, Your Honor. We're way beyond the record. But you brought it up. You said that if she had a power of attorney, you would have told her what to do. You would have told her what to do. Now, that gets to the issue of what did we tell her. It is at the bottom of the form. It says amount due. $1,273.05. And it has a blank amount enclosed. And you say there were two of those that relate. There were actually three of those. There was the premium payment notice in December, the grace period notice at the end of January, and then the lapse notice. I'm talking about the amount of money they owe as of June. That would be twice $1,273. Yes, sir. And as you noted in your question in opposing counsel, she knew that. She had made 10 of the last 13 payments on this policy. She had knowledge of how much the premiums were due and how much he had to pay. You could have sent her a check, rather than making that phone call. And if you had put it in the bank, it would have been a tougher spot. Exactly. Exactly. And normally in these cases, at least what I've dealt with and what I've seen reported in reported cases from this court and the lower court, you're typically, in these kind of cases, you're dealing with an act by an insurance company that somehow leads a person to believe that they're going to accept payment or they're going to do something to keep the policy in place. There is a true estoppel issue. In other words, the insurance company, because of a prior action, is a stop to deny that in this particular case they're not going to cancel the policy. Jackson National, through its course of dealing or its business practices or anything with William Wachter, or Mrs. Wachter, did nothing to lead them to believe, have a reasonable basis to believe, that Jackson National would not cancel this policy if he did not make payment within the 30-day lapse period or within the time given. They simply did not. They had never taken late payments beyond the grace period. They had not done any act to lead Mr. Wachter to believe that you can sit back and wait and pay whenever you want to. They had never led Mrs. Wachter to believe, even in the phone call, that she could do anything more than get evidence of insurability and make the premium payment or get him to authorize her as his representative either through a power of attorney, guardian ad litem, or a simple phone call from him. Now, I understand he may not have been in the physical condition to do that, but again, that's unfortunate. It's sympathetic. But it's not Jackson National's fault. By that point, the policy had been lapsed for 107 days. Again, there's nothing Jackson National did in its course of dealing. Mr. Poliakoff wants to talk about notice and receipt of notice. There is nothing in this record, nothing. And Judge Koehn pointed that out clearly in his order. There's nothing in this record that indicates that Jackson National ever dealt with Mr. Wachter differently than they did in this particular case in 2009 and 2010. Notice was never required. Jackson National never sent the notices, return, receipt. The policy is silent as to it. South Carolina law doesn't require it. South Carolina law does require return, receipt, certified mail to cancel automobile policies and homeowner's policies, but not insurance, not private life insurance policies. So the course of dealing between Jackson National and Mr. Wachter, again, is completely consistent throughout all these facts. Jackson National is not taking any position in this case different than what they had in the past. Mr. Poliakoff wants to bring up the issue of the privacy policy. Mrs. Wachter attempted to communicate with Jackson National in 2007, and this is in our memo and the evidence we supplied to Judge Koehn on our motion for summary judgment. In 2007, Ms. Wachter contacted them because they weren't receiving statements on their insurance policy. And Jackson National said, ma'am, we can't deal with you because you're not authorized on the policy. You're not an owner of the policy, and the owner hadn't authorized us to give you information. You'll have to get the owner to contact us, which she did. Mr. Wachter then followed up, and Jackson National changed the address on the file, on the policy, to make sure they would get those notices. Again, that's all within the course of dealing of the parties, the business practices. That is completely consistent in this case. There's nothing Jackson National, again, I can't say this enough. I know I'm repeating myself. There's nothing Jackson National did that they should be stopped to deny they have the right to cancel this policy. There's nothing they did that led Mr. Wachter to believe they wouldn't cancel the policy. Mr. Turner, I think we've got your argument. And on the bad faith side, even Mr. Finkel, the plaintiff's expert, agrees that there's a reasonable basis to deny the claim because the policy was lapsed. I know Mr. Pulikoff says the letter is fraud. It's not fraud. The policy had lapsed, and there was no coverage when the letter was sent. Charlie Fields, his name was affixed electronically. His department generates those letters. There was an investigation. They certainly looked at the policy and found out it was lapsed. There's no dispute that the policy's lapsed. Mrs. Wachter and their expert, Mr. Finkel, concedes the policy had lapsed. So there's no bad faith here because we had a reasonable basis to act as the way we acted. There is no investigation that should take place other than determining what the status of the policy is. I realize Mr. Pulikoff wants us to go back and look at the reasons why the payments were made, but that simply is not required by the policy, and it's not required by South Carolina law. It is a sympathetic case, but I can't imagine Jackson National could have done anything more than they did. They sent three notices. There's no history of requiring receipt. There's no evidence in the case he did not get them, and there's really no dispute about that. Thank you very much. Thank you very much. May it please the Court, the right of reinstatement is not something that we can gloss over, and we must view it in combination with this, quote, privacy policy that Jackson National uses for its own selfish purposes in any way that only benefits Jackson National. The provision on reinstatement in the policy, it's titled, How a Policy Endowed May Be Reinstated. Quote, This policy may be reinstated within five years after the date of any past due premium. Reinstatement is subject to, and it provides two conditions. Receipt of proof or evidence of insurability is what it says, and then payment of the past due premiums and any interest. When Nancy Wachter called on June 10, she had no idea how much was owed. Had they told her, she said her testimony was, I would have gotten them a check immediately. She had no way to know what to put in the check. She didn't know how much. Well, she knew that she owed two of the quarterly premiums of $1,273.05, plus 6% interest. No, so she didn't know that on June 10. She didn't know if he had missed payments. She was calling to check on status because she had recently learned that he missed his credit card and phone bill payments, two things that he also handled himself. She didn't know if he had missed payments, and if so, she didn't know how many payments he might have missed. So she's calling to see what's the status number one. They say it's lapsed. And then she says in the transcript, if you'll tell me, I'll catch up the payments. And then her deposition testimony was, I would have paid that immediately. She had no idea what to put into the check. Now, my counsel for defense says, quote, she has no rights under the policy. But under this privacy policy, Jackson National, for its own selfish purposes, can give personal financial information of William Wachter to non-affiliated third parties whom it doesn't define, who it can't say who they are, can't tell us any person at Jackson National who can tell us what third parties can get his information under the policy, nor can they tell us any guidelines for who these third parties are. In other words, if it suits Jackson National's purposes to give his personal financial information out to non-affiliated third parties, they can do it. But to the wife, who's the sole beneficiary, the wife, she's been in the picture these whole 19 years. She has no rights. So what Jackson National is doing is they're nullifying the right to reinstatement, which is provided for by statute and extended to five years in this policy. They nullify her right to make use of that by this arbitrarily used, quote, privacy policy where they can give his personal financial information to anybody they want to, but decide when it's wife's time to try to reinstate a policy that's 19 years into it for a man 74 years old who apparently has some medical issues, let's don't give the information. That's Jackson National. The established course of dealing is to provide notice. They had established 22 times providing notice by a course of dealing. Case law in South Carolina specifically says that insureds can rely on the course of dealing and insurance contracts can be modified by the course of dealing, which is what occurred here. Jackson National doesn't have standards for defining insurability. They don't have defined standards for who they can give information or withhold information from because they use those things for their own selfish needs and contrary to the needs and rights of its insureds. Is Jackson Kelly a publicly held corporation? Jackson National? Yes. I assume that it is. Well, its own selfish needs are the needs of the shareholders or the owners. I mean, they have a fiduciary duty to act in response to those needs, right? To its corporate family. I mean, you know, corporations have rights too apparently in the United States of America. Certainly they do, but here they've got provisions. I understand that ruling, Your Honor. Here, though, we've got a policy where the policyholder, which drafts the policy, and again, ambiguities in a policy are to be construed. You're right. I'm sure there's some ambiguity. But what the insurance company does is by failing to define things like insurability and failing to define who they can give information to and who they should withhold information from. Any person that is on his deathbed, it seems to me, is by definition, by any definition, you want to use on insurance. My time is up. May I answer? That's hindsight, Your Honor, and it's a jury issue. Well, but if it would take some amount of time to procure that, it wouldn't have been hindsight by the time they made this determination. Had the wife been given the same information that non-affiliated third parties... On the day she called. She called the day before she died, right? She'd have issued a check and she'd have gotten a letter from her doctor as to what his condition was. And then it's a jury question as to, number one, what does, quote, insurability mean? Because it's not defined in the policy. But it says insurability as satisfactory to the company. Satisfactory to the company. In insurance law... So they'd have to... They're the ones that have to decide. It does say that, Your Honor. Under the policy. But those things can't be arbitrarily determined and they can't be unreasonably determined. That goes back to the duty of good faith and fair dealing. An insurance company can't have vague terms and define them as they please to nullify what's a statutory right, which is what they've done. The effect is to nullify the statutory right and the policy right of reinstatement. Thank you very much for your argument. We will come down and get your lawyer in a moment. We'll take a short recess. We'll take a brief recess.
judges: Diana Gribbon Motz, Robert B. King, Arenda L. Wright Allen